The Honorable Paul Miller State Senator Post Office Box 488 Melbourne, AR 72556-9511
Dear Senator Miller:
I am writing in response to your request for an opinion on nine questions involving various matters pertaining to the law as it applies to Cherokee Village Suburban Improvement District (hereinafter "the District" or "SID"). I will address your questions individually, in the order posed.
Question 1 — Cherokee Village Suburban District No. 1 (the District), wascreated in 1969 in accordance with the provisions of Act 41 as amended,(particularly Act 286). Proposed administrative actions by theCommissioners of the District frequently state that these are inaccordance with Chapter 14-92, from which this District is specificallyexcluded by Subchapter 14-92-202.
Does this affect the validity of the actions so undertaken?
It must be initially noted that this question appears to be premised upon the incorrect assumption that A.C.A. § 14-92-202 excludes the District from all of the provisions of Arkansas Code Title 14, Chapter 92. Section14-92-202 (a) (Repl. 1998) states:
 The provisions of Acts 1981, No. 510, shall not apply to districts in existence on March 16, 1981, and these districts shall continue to be governed by the law in effect immediately prior to that date.
Act 510 of 1981 amended various sections of Act 41 of 1941, as amended, to provide, inter alia, new procedures for creating and dissolving suburban improvement districts. See Op. Att'y Gen. 95-348 (summarizing the legislative history of A.C.A. §§ 14-92-202, -209, and -240, involving the selection and recall of suburban improvement district commissioners). The statement in Act 510 of 1981 that districts created prior to March of 1981 "shall continue to be governed by the law in effect immediately prior to that date," does not have the effect of rendering inapplicable all of the provisions of Chapter 92 of Title 14 to so-called "pre-1981" districts. See Op. 95-348, supra (enclosed herein). Chapter 92 of Title 14 is the codification of various provisions pertaining to suburban improvement districts, many of which continue to apply to pre-1981 districts such as the District, either as originally enacted under Act 41 of 1941 (see, e.g., A.C.A. § 14-92-218 (change of plans), as amendments to Act 41 (e.g., A.C.A. § 14-92-220 (powers generally), or as separate enactments (e.g., A.C.A. § 14-92-401 (sale of property).
With regard to your specific question, therefore, it is my opinion that the District is not excluded from all provisions of Chapter 92 of Title 14, and that the validity of actions undertaken by the District's Commissioners will be determined by considering the particular undertaking, viewed in light of the authority relevant thereto.
Question 2 — Chapter 14-92 differs significantly from Act 41 in theprocedures by which Suburban Improvement Districts are to be created. Thepowers of the Commissioners are expanded but this is balanced by therequirement that such Commissioners are to be elected, and their numbersincreased to five or seven.
If it is held that Chapter 14-92 may be used to carry out administrativeactions of the Board, does this not imply that the Board of Commissionersshould be elected?
The answer to this question is "no," in my opinion. The fact that the District's Board may act pursuant to provisions in Title 14, Chapter 92, does not mean that the Commissioners are to be elected. The selection and recall of suburban improvement district commissioners in pre-1981 districts is addressed at length in Attorney General Opinion 95-348, which I have enclosed herein for your convenience. I refer you to that opinion for a complete understanding of the available alternatives for electing the District's commissioners.
Question 3 — On occasion, the wording of Chapter 14-92 has beenarbitrarily amended by Legal Advisors to the District in order to changethe import of the law, presumably to serve a particular purpose.
Does this constitute impropriety?
You have provided no specific examples of such action by the District's legal advisors, but as a general matter any amendments to Title 14, Chapter 92, must be made by the General Assembly through the regular legislative process.[1] Legal advisors may offer their views on how to interpret or apply these Code sections. The law is not thereby "amended," however.
Question 4 — The Community of Cherokee Village has been an incorporatedCity of the First Class since 1998, and appears to have the sameconstitutional powers as the District. These include but are not limitedto the power of Eminent Domain, ability to levy taxes, enact Ordinancesor By Laws, be responsible for the care and maintenance of streets androads, recreational facilities and other "Commons."
Does this represent double taxation of the Property Owners, and ignorethe Statutory requirement that there may not be, with, and within thesame boundaries, two or more municipalities exercising the same powers?
The answer to this question is "no," in my opinion. The concept of "double taxation" ordinarily connotes taxing the same property twice for the same purpose, by the same taxing authority. 84 C.J.S. Taxation at 131. Clearly, the City of Cherokee Village and the District are distinct entities with separate constitutional (in the case of the city) and statutory (in the case of the District) authority to levy taxes. Seegenerally Ark. Const. art. 12, § 4 (city's taxing authority) and A.C.A. § 14-92-220 (suburban improvement district's authority to assess benefits and levy the appropriate tax against such assessment). See also generallyQuapaw Central Business Improvement District v. Bond-Kinman, Inc.,315 Ark. 703, 706, 870 S.W.2d 390 (1994) (observing that improvement districts derive their taxing power from the state and "constitute a separate and distinct species of taxing districts as contradistinguished from counties, municipal corporations and school districts.")
It is also clear that the District is not a municipality. The Arkansas Supreme Court has defined a "municipality" as is "a public corporation created for governmental purposes, and having local powers of legislation and self-government. . . ." Memphis Trust Co. v. St. Francis LeveeDist., 69 Ark. 284, 286, 62 S.W. 902 (1901). Such "inferior corporations" as improvement districts, on the other hand according to the court, "lack the broad legislative, judicial, and political powers that are essential to administering local government." Id. (quoting a Missouri case where the court said that the term "municipal corporation" included only cities, towns and other like organizations with political and legislative powers for the local government and police regulation of the inhabitants thereof). See also Nakdimen v. Bridge District, 115 Ark. 119, 121,172 S.W. 272 (1914) (stating that an improvement district is not a municipality and its powers cannot be likened to those of municipal corporations, "whose powers are broader and more general within their prescribed territory and over the subjects delegated to them.")
Question 5 — If indeed, duplication of powers is inadmissible, whichentity prevails, the SID or the City?
Because, as indicated above, the SID and the City are separate entities with distinct powers, there is generally no "duplication of powers" or question of one entity "prevailing" over the other. While it is conceivable that conflicts could arise in the exercise of the powers and duties granted under state law to the SID and those granted to the City, I cannot in the context of this opinion undertake a review of all the powers and duties granted to a municipality and a suburban improvement district or speculate as to any such potential conflicts. Subtitle 3 of Title 14 of the Arkansas Code Annotated sets forth both general and specific areas of municipal authority, and Article 12 of the Arkansas Constitution sets forth the primary constitutional provisions pertaining to municipal corporations. Chapter 92 of Title 14 of the Arkansas Code Annotated sets forth the general rules regarding suburban improvement districts; A.C.A. § 14-92-220 (1987) prescribes the general powers of a district. These are the provisions that would be applied to the particular facts and circumstances in determining the respective authority of the SID and the City.
Question 6 — Recent negotiations between the Board and the State LandCommissioner have resulted in the SID becoming the owner of manydelinquent lots within the District. These are now being offered for saleby a partnership which has concluded an exclusive contract with the Boardto `market' such lots. These are represented as clear of any obligationfor delinquent taxes and penalties.
Is the eventual owner liable for such delinquent taxes, or does the SID,the Board of Commissioners or the Land Commissioner have the power orauthority to extinguish or forgive such taxes?
You have provided no information as to how the SID became the "owner" of the lots through "negotiations." Nor have you identified the particular "delinquent taxes" in question. I am therefore uncertain whether this refers to general property taxes or delinquent improvement district assessments. The Commissioner of State Lands is authorized in certain instances to negotiate the sale of property that has been certified to the state for nonpayment of general taxes. See A.C.R.C. Notes to A.C.A. § 26-37-101 (Repl. 1997) (containing uncodified language fromAct 626 of 1983, as amended) and A.C.A. § 26-37-202 (b) (Repl. 1997). See also generally Carter v. Green, 67 Ark. App. 367, 1 S.W.3d 449
(1999) (regarding a negotiated sale as authorized when land remains either unsold or unredeemed). With regard to suburban improvement district taxes, a procedure is available whereby delinquent property may be "bid off" to the district in foreclosure proceedings in chancery court. See
A.C.A. § 14-92-232 (c) (Repl. 1998) (authorizing use of procedures under A.C.A. § 14-94-122 for collection of delinquent suburban improvement district assessments).[2]
The applicability of these provisions must therefore be considered in addressing your question regarding any outstanding delinquent tax liability. As a general matter, there is no authority to extinguish or forgive, i.e., "waive" improvement district assessments. See generally
Op. Att'y Gen. 2003-122 (concluding that the Briarcliff Improvement District could not waive delinquent improvement district assessments on property which had been forfeited to the state). It is possible, however, that the SID holds deeds from the Commissioner of State Lands through the above procedures, in which case there may in fact be no delinquency for the eventual owner to satisfy. I cannot definitively opine in this regard, however, without more information regarding the process by which the SID obtained ownership of the lots.
Question 7 — Does the Law require the Commissioners to file annualStatements of Financial Interest? And is the Clerk of the County Courtrequired to maintain such records?
This question should be referred to the Arkansas Ethics Commission, which by law issues advisory opinions on the requirements of Title 21, Chapter 8 pertaining to financial disclosures. See A.C.A. § 7-6-217 (g) (2) (Supp. 2001).
Question 8 — Under the provisions of Act 41, the Commissioners of theDistrict are self-appointed. It is generally understood that by theprovisions of Act 286, as amended, Cherokee Village Suburban ImprovementDistrict No. 1 is the only such District in the State of Arkansas.
Does this not represent arbitrary discrimination against a specific groupor class, and thus constitute a violation of our Civil Rights?
I assume by your reference to the Commissioners being "self-appointed" that you mean the procedure applicable to pre-1981 districts under which vacancies on the Board are filled by the remaining commissioners. Seeformer Ark. Stat. Ann. § 20-703. While Cherokee Village Suburban Improvement District No. 1 may, as a practical matter, be the only district in existence subject to this procedure, I must respectfully disagree with the suggestion that the provisions apply only to Cherokee Village Suburban Improvement District No. 1 as a matter of law. I have found no reference to Cherokee Village in the law, and there is language in Act 286 of 1967, amending Act 41, § 4, referring to "any district" which clearly indicates that the provisions apply to all suburban improvement districts covered by Act 286. Given both this language and the absence of any reference to Cherokee Village, I must respectfully disagree with the premise of this question. In my opinion there is no discrimination against any specific group or class by virtue of this legislation. It may also be helpful to note, as pointed out above in response to Question 2, that procedures for electing the Commissioners are available to realty owners in pre-1981 districts. See again Op. Att'y Gen. 95-348 (enclosed).
Question 9 — The Law (Act 41) requires the County Tax Collector tocollect SID taxes at the same time that ad valorem taxes are collected.Additionally, the Collector may not collect one without collecting theother.
Is it within the power of the SID and/or the County to enter into anagreement to circumvent this requirement or make any such agreement whichwould involve payment by the SID of ad valorem taxes, other than asprescribed by law?
In accordance with A.C.A. § 14-92-230 (d), the payment of suburban improvement district taxes is a prerequisite to paying ad valorem real property taxes. This provision states:
 A property owner shall be required to pay applicable suburban improvement district taxes provided in this subchapter as a prerequisite to paying his ad valorem real property taxes.
A.C.A. § 14-92-230(d) (Supp. 2001).
I am unaware of any authority for circumventing this requirement. Applicable SID taxes must be paid before ad valorem taxes can be paid.
Regarding the SID's payment of ad valorem taxes "other than as prescribed by law," I refer you to the case of Pulaski County v. Carriage CreekImprov. Dist., 319 Ark. 12, 888 S.W.2d 652 (1994). The Arkansas Supreme Court in that case upheld the trial court's ruling that property acquired and held by an improvement district as the result of foreclosure for failure to pay improvement district assessments, (pursuant to A.C.A. §14-94-122; see n. 2, supra), is not subject to taxation. The ruling was based on an affidavit of one of the district's commissioners stating that the lots were "held by the District in its governmental capacity pending sale of the Lots to recover delinquent taxes and penalties. The District is not leasing the lots or otherwise utilizing the Lots in any proprietary manner." 319 Ark. at 15.
I lack sufficient facts to determine whether this case is applicable; and in any event, this determination lies with the county assessor who must in the first instance review the particular facts and decide whether the law prescribes the payment of ad valorem taxes by the SID. Hopefully, however, this provides a sufficient legal framework for you to apply in analyzing the particular surrounding circumstances in this instance.
Assistant Attorney General Elisabeth A. Walker prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB:EAW/cyh
Enclosure
[1] The power to initiate amendments is of course reserved to the electorate under Ark. Const., amend. 7.
[2] Section 14-94-122 authorizes a commissioner of the court to bid off the lands in the name of the improvement district in cases where the sum of the delinquent improvement district taxes, together with interest and penalty, is not bid in the sale after judgment is obtained in a foreclosure proceeding in chancery court. See A.C.A. 14-94-122 (g).